UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS TAGEN THOMPSON,

      Petitioner,

                                    Civil Action No. 2:10-cv-15090

v.                                   Honorable Lawrence P. Zatkoff

PAUL D. KLEE,

      Respondent.

_____/

**I. INTRODUCTION**

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS
CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

## I.  INTRODUCTION

This is a habeas case filed by a state prisoner under 28 U.S.C. § 2254.  Michigan

prisoner Nicholas Tagen Thompson is incarcerated by the Michigan Department of

Corrections, at the Lakeland Correctional Facility in Coldwater, Michigan. He filed this

Habeas Petition, through counsel, challenging his 2007 convictions in two separate cases; in

case number 06-011226-FH, Petitioner was convicted of first-degree home invasion and

domestic violence, third offense, and, in case number 06-11227-FH, he was convicted of

domestic violence, third offense, and interfering with a telephone communication.

Petitioner's convictions occurred in the Circuit Court in Bay County, Michigan, following

a four-day jury trial.  He was sentenced on May 7, 2007, as a third-offense habitual offender,

to concurrent prison terms of seven to twenty years for his home-invasion conviction and

thirty-two months to four years for his remaining convictions.  In his Habeas Petition,

Petitioner raises a single claim concerning the effectiveness of his trial counsel.  For the reasons discussed below, the Court will deny the Petition.  The Court also will decline to issue Petitioner a Certificate of Appealability.

## II.  FACTUAL BACKGROUND

Petitioner's convictions arise because of a domestic violence incident that occurred on October 22, 2006, at the home of his girlfriend Megan Ladrigue ("Ladrigue").  The prosecution theorized that Petitioner forced his way into Ladrigue's home, assaulted her, and prevented her from calling 911.  Petitioner denied the allegations, arguing that Ladrigue's testimony was contradicted by other witnesses and that he was not capable of committing the offenses because he had fractured wrists at the time of the alleged incidents.  Prior to trial, defense counsel filed a motion requesting to exclude other-acts evidence: the evidence of prior acts of domestic violence against Megan Eigner ("Megan"), Petitioner's former girlfriend, and the evidence of a prior domestic assault against Ladrigue.  The trial court denied the motion.  Petitioner did not testify.

### A.  TRIAL TESTIMONY

At trial, Ladrigue testified as to the events that occurred on the night in question, describing the various ways in which the Petitioner was violent and aggressive towards her including punching, shoving, dropping her down a flight of stairs, and placing her in a choke hold.  Ladrigue also testified as to a prior incident of domestic violence involving Petitioner.  Ladrigue testified that in March 2006, after an argument in the car, Petitioner grabbed her purse and ran into his apartment.  She ran after him in order to get her purse.  Once inside,

they argued and Petitioner threw her purse against the wall, causing the contents to spill.
When she bent down to get the items, Petitioner picked her up and pushed her into a
doorway.  She had to hang onto the stair railing to stop herself from falling. After that
incident, she went to the hospital.  She also spoke to the police.

Megan Eigner, Petitioner's former girlfriend, testified at trial in regard to two
domestic violence incidents that occurred while she and Petitioner were dating.  Megan
testified that she began dating Petitioner when she was thirteen-years-old and he was about
seventeen-years-old and that they dated on and off for about five to six years.  She testified
that in 1999, when she was fifteen-years-old, they got into an argument at a friend's house.
She said Petitioner put her in the car against her will, would not let her out, and drove off.
Because she was afraid, she told the police that it was okay and denied that she had not been
free to leave.  Then, in 2002, Petitioner came by her house and got upset that a male friend
was visiting.  When she did not answer the door, he crawled in through her bedroom window.
Petitioner told her friend to leave and threatened to beat him up.  When she used the phone
to call the police, he slapped the phone out of her hand.  The call, however, went through and
the police came to her house.  Petitioner pushed her against the wall and held her down to
try to keep her from answering the door but she escaped and answered the door.

On cross-examination, Megan admitted that she testified at the preliminary-
examination hearing that Petitioner had permission to enter her house.  On redirect, she
testified that she lied at the preliminary-examination hearing because Petitioner told her to.
She also said her parents were close to Petitioner and that she feared physical consequences.

3

Sheila Eigner, Megan's stepmother, testified that Petitioner had permission to enter her home at any time, even if she was out of town.  She said Petitioner was like her son.

Rene Jacobs, a social worker, testified at trial as an expert in domestic violence.  She said domestic-violence relationships have common features.  In addition to physical violence, the batterer attempts to control his victim in various ways, including intimidation, emotional abuse, isolation, blaming the victim, and threats and coercion.  Most victims leave their batters seven to eight times and return, before leaving for good.  She said she did not interview Ladrigue.  She testified that batterers are never cured.

## B.  PETITIONER'S PHONE CALLS WHILE INCARCERATED

At trial, the prosecutor sought to introduce into evidence three jail calls from Petitioner to Megan, in which he asked her to say certain things.  Because defense counsel had elicited that Megan lied under oath at the preliminary-examination hearing, the trial court allowed the prosecutor to play the calls.  Prior to trial, the trial court ruled that the prosecutor could not introduce those calls but since defense counsel opened the door to the tapes, the trial court found that they were now admissible.  The prosecutor also sought to introduce a separate phone call placed by Petitioner to Sheila Eigner, Megan's stepmother, in which Petitioner stated that he was in jail, that his bond was $25,000, that he'd been charged with a felony, that the felony was home-invasion, third-degree, and that he might go to prison

## III.  PROCEDURAL BACKGROUND

The jury convicted Petitioner as charged.  He was sentenced as described.  Both state appellate courts affirmed his convictions and sentences.  *People v. Thompson*, No. 278243,

2008 WL 7488022, at *1, 6 (Mich. Ct. App. Dec. 16, 2008); *People v. Thompson*, 772 N.W.2d 336 (Mich. 2009) (Table).   Petitioner neither filed a Motion for Relief from Judgment with the state trial court nor a Petition for a Writ of Certiorari with the United States Supreme Court.  Rather, on December 22, 2010, he filed this Habeas Petition.

## IV.  DISCUSSION

### A. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when a state court has applied clearly established federal

5

law in an objectively unreasonable manner. *Id.* at 409. A federal habeas court may not issue a writ if it concludes the state court applied clearly established federal law merely erroneously or incorrectly. *Id.* at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. ---, ---, 130 S.Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. ---, ---, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S.Ct. at 786 (citation omitted).

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state [-]court's decision conflicts with" the Supreme Court's precedents. *Harrington*, 131 S.Ct. at 786. Indeed, "[s]ection

6

2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)) (Stevens, J., concurring in judgment)).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.

A state court's factual determinations are presumed correct on federal habeas review. See 28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption only with clear and convincing evidence.  *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir.1998).  Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. ---, ---, 131 S.Ct. 1388, 1398 (2011).

With those standards in mind, the Court proceeds to address Petitioner's claim.

## B.  INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM

Petitioner contends that his trial counsel was ineffective on three separate occasions: counsel's impeachment of Megan Eigner opened the door for the admission of the tape-recorded phone conversations between them; counsel elicited a damaging propensity statement from the prosecution's domestic violence expert; and counsel failed to object to the playing of a tape-recorded conversation between himself and Megan's stepmother.

Claims of ineffective assistance of counsel are measured under the standards established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668,

687-88 (1984).  Petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced him, resulting in an unreliable or fundamentally unfair outcome.  *Id.*  In adjudicating the first prong of the standard, the Court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  To prevail on the second prong, Petitioner must demonstrate a "reasonable probability" that the result of the trial would have been different but for counsel's errors.  *Id.* at 694.

Under *Strickland*, counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690 (the Sixth Amendment is violated only if counsel's acts or omissions were outside the range of professionally competent assistance).  Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable."  *Id.*

Additionally, recently, the Supreme Court in *Harrington* confirmed that a federal court's consideration of ineffective-assistance-of-counsel claims arising from state-criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance.  "The standards created by *Strickland* and [section] 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Harrington*, 131 S.Ct. at 788 (internal and end citations omitted).  "When [section] 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied

8

*Strickland's* deferential standard." *Id.*

Citing *Strickland*, the Court of Appeals, although finding that counsel's decision was not sound trial strategy in this particular instance, rejected Petitioner's claim because it found that counsel's decision was not prejudicial. Petitioner alleges that the Court must adopt that determination. That is not the case. A state court's resolution of an issue in a petitioner's favor is not entitled to deference under the AEDPA because the standard of review is a "precondition to the grant of habeas relief [], not an entitlement to it." *Fry v. Pliler*, 551 U.S. 112, 119 (2007); *see also Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir. 2007) (same).

The Court of Appeals stated:

> While defendant has overcome the presumption of sound trial strategy, he has not established that but for defense counsel's deficient performance, the outcome of the proceedings would have been different. The evidence presented at trial, even absent the tape-recorded phone conversations and Jacobs'[s] testimony about rehabilitating domestic abusers, was more than sufficient to establish defendant's guilt. The victim provided a detailed description of the events in question and several witnesses, including the victim's friends, defendant's neighbors, and investigators, corroborated her testimony. The only person who provided conflicting testimony was defendant's mother, and she admitted that defendant and the victim were alone for significant periods of time that night. The jury also heard evidence that defendant committed prior acts of violence against the victim and his former girlfriend. Further, as previously indicated, the trial court instructed the jury on the limited purpose of the tape-recorded conversations between defendant and his former girlfriend. The court also instructed the jury that the conversation between defendant and the stepmother was not evidence and that it was admitted for the sole purpose of refreshing the witness's memory. Considering the evidence presented at trial and the limiting instructions provided by the trial court, defendant's ineffective assistance claim must fail.

*Thompson,* 2008 WL 7488022, at *5 (internal and end citations omitted).

*1. Impeachment of Megan Eigner*

9

Petitioner first claims that counsel should not have "opened the door" to the taped conversation with Megan Eigner. However, the Court finds that a reasonable attorney might have considered the risk worth taking, given that Megan's testimony was highly provocative and damaging.

Defense counsel knew that the prosecution would be eliciting testimony from Megan regarding prior acts of domestic violence committed by Petitioner. Therefore, it goes without saying that her testimony would bolster Ladrigue's credibility. Thus, defense counsel had to make a tactical decision: should he allow one of the most damaging witnesses to testify without attempting to impeach her and hope that the other evidence would be enough to minimize the effect of her testimony, or should he impeach this key witness and hope the jury would find the rebuttal evidence insufficient to rehabilitate her credibility. He chose the latter. In making that decision, he was no doubt aware that the trial court would give appropriate cautionary instructions, which it did.

Decisions regarding how to cross-examine and impeach witnesses are matters of pure trial strategy and defense counsel is given wide discretion in these matters. "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) (citation omitted).

Undoubtedly, the decision to impeach Megan was not without risk. However, in light of the evidence that was being presented, it was a calculated, if not necessary, risk. More importantly, by taking that risk, defense counsel was able to show that Megan had previously

10

lied multiple times about the prior acts of domestic violence. By showing that she had lied
about the prior incidents of domestic violence, defense counsel was successfully able to cast
doubt upon her credibility. That was certainly advantageous to the defense, as she was a key
witness for the prosecution. As correctly noted by the trial court:

> You [defense counsel] had the most powerful evidence for impeachment of
> a witness that you could hope to have, direct testimony under oath, subject to
> cross-examination, where the witness said the exact opposite of what she said
> here in court today. There's nothing more powerful th- -than that sworn
> testimony to- -to impeach a witness. You used it. And the prosecution is
> entitled to attempt to restore the credibility of their witness to overcome your
> impeachment.

Trial Tr. vol. III, 37-38 Mar. 22, 2007, ECF No. 5-5.

After Megan was impeached, the prosecution moved to admit three jail calls made by
Petitioner to her. The calls involved Petitioner having detailed conversations with her about
what she should say in court. Defense counsel objected but the trial court ruled that the tapes
were admissible. Defense counsel continued to argue, insisting that the trial court listen to
the tapes before playing them to the jury. The trial court agreed. After listening to the tapes,
the trial court stood by its ruling. Defense counsel subsequently moved for a mistrial and a
directed verdict. The trial court denied both motions.

The Court finds that defense counsel was passionately advocating on behalf of his
client. The fact that his strategy of impeaching Megan resulted in the taped phone calls being
admitted at trial does not necessarily mean that his strategy was unreasonable under
prevailing professional norms. It simply means that the strategy did not work out as counsel
had hoped. The Court will not substitute its judgment for that of trial counsel regarding

11

matters of trial strategy, even if the strategy was not successful.

### 2. *Questioning of Rene Jacobs*

Petitioner also alleges that counsel was ineffective for eliciting damaging propensity evidence from the prosecution's expert Rene Jacobs. On direct-examination, Jacobs testified to common features of domestic-violence relationships. On cross-examination, defense counsel elicited that Jacobs did not interview Petitioner or the victim, that she was only making general statements, and that there were plenty of exceptions to the general commonalities. Petitioner contends that during recross-examination, Jacobs stated: "from my experience - - that people are - - if you're a batterer, you're never cured." Trial Tr. vol. II, 11 Mar. 22, 2007, ECF No. 5-4. However, that statement was nothing more than a generalization and did not relate specifically to Petitioner. Jacobs admitted as much when she stated that she was only "making general statements." *Id.* at 8.

Furthermore, after Jacobs made the statement, defense counsel attempted to discredit her by showing that her generalizations do not apply in every case and make no sense in light of the practice of counseling for batterers. The following colloquy took place:

> [DEFENSE COUNSEL]:   You're - - you're aware of all the counseling programs that - - that go on, that we have for domestic batterers and stuff like that?
> [JACOBS]: Mmhmm.
> [DEFENSE COUNSEL]: And you're trying to tell us, and you're telling this jury that none of them are ever successful? Why do we send 'em?

Trial Tr. vol. II, 12, Mar. 22, 2007, ECF No. 5-4.

The above exchange demonstrates that defense counsel was attempting to discredit

the witness by showing that her generalizations do not apply in every case and make no sense in light of the accepted practice of counseling for batterers. The Court finds that defense counsel was acting well within the objective standard of reasonableness under professional norms as required by *Strickland*.

### 3.  Taped Conversation Between Petitioner and Sheila Eigner

In his final ineffective-assistance-of-counsel claim, Petitioner argues that counsel was ineffective for failing to object to the prosecutor's introduction of a taped conversation between Petitioner and Sheila Eigner. During direct examination by defense counsel, Sheila testified that Petitioner was just like one of her sons and that he had permission to enter her home. Sheila testified that she did not have a problem with Petitioner being at her house at any time.

On cross-examination, Sheila was asked if Petitioner had "made the statement that he looked in a window and he saw her [Megan Eigner] with another guy and got pissed off," to which she replied, I wouldn't know about that though." Trial Tr. vol. III, 123 Mar. 22, 2007, ECF No. 5-5.  She was then asked by the trial court, "Have you ever talked to Nick Thompson about that incident?" *Id.* at 125. She initially replied, "I don't think so, no." *Id.* However, upon further questioning by the prosecution, she stated, "No, because they had broken up after that. So, then Nick wasn't around the house. I mean so I would not have called him to say, you know, - -." *Id.* at 126.

Thereafter, Sheila began to back-pedal and stated, "I've talked to Nick so many times throughout my life, you know, I really can't - - this is four years ago. []. I mean we don't

13

rehash what happened four and five years ago with the kids, no." Trial Tr. vol. III, 127 Mar. 22, 2007, ECF No. 5-5. She then was asked if a conversation were to be played where she was talking to Petitioner would that help refresh her memory. She said it would. The prosecutor then played a taped jail call from Petitioner to her in order to refresh her memory. The call contained statements by Petitioner that he was in jail, that his bond was $25,000, that he'd been charged with a felony, that the felony was home-invasion, third-degree, and that he might go to prison. *Id.* at 130–33. Petitioner argues that counsel was ineffective because he failed to object to the phone conversation being played.

The Court finds that Petitioner's argument is without merit for several reasons. First, the information that Petitioner had been arrested and charged with home invasion and domestic violence was not a surprise to the jury. The jury had already heard Megan testify that Petitioner broke into her home, assaulted her, and that she had called the police. The jury knew that Petitioner was charged because she had been impeached with her prior preliminary-examination testimony.

Moreover, defense counsel had objected to the playing of the three taped jail calls between Petitioner and Megan, and the objections were overruled by the trial court. Thus, defense counsel could have reasonably thought that any further objections would be futile.

Second, the taped phone call was not admitted into evidence; rather, it was played strictly for the purpose of refreshing Sheila's memory. Following the playing of the taped phone call, the trial court gave a cautionary instruction.

The Court concludes that defense counsel's failure to object to the taped phone call

14

was not unreasonable and he was acting well within the objective standard of reasonableness under prevailing professional norms.

However, even if this Court were to hold that defense counsel was deficient in the challenged areas, Petitioner has failed to demonstrate that the Court of Appeals's determination that he was not prejudiced is unreasonable. The evidence of Petitioner's guilt was overwhelming based on the victim's testimony alone.

With that, the Court concludes that Petitioner has failed to show that defense counsel was ineffective. He is not entitled to habeas relief.

## C. COURT DECLINES TO ISSUE PETITIONER A CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must "issue or deny a [COA] when it enters a final order adverse to the applicant . . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11, Rules Governing Section 2254 Proceedings.

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b). To receive a COA "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the

15

petition should have been resolved in a different manner or that the issues presented were

adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal

quotes and citations omitted).

For the reasons stated in its Opinion and Order, the Court concludes that reasonable

jurists would not find its assessment of Petitioner's claim debatable or wrong.  The Court

therefore declines to issue Petitioner a COA.

## V.  CONCLUSION

Accordingly, IT IS ORDERED that the "Petition for Writ of Habeas Corpus" [ECF

No. 1] is DENIED.

IT IS FURTHER ORDERED that the Court declines to issue Petitioner a COA.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

DATED: January 30, 2013

16